IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| CITY HOMES, INC. | * | Case No: 13-25371-NVA |
| | | (Chapter 11) |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| CITY HOMES BRETTON LLC | * | Case No: 13-25372 |
| CITY HOMES EAST BUSINESS TRUST | | Case No: 13-25373 |
| CITY HOMES III LLC | * | Case No: 13-25370 |
| CITY HOMES JOHNSTON SQUARE LLC | | Case No: 13-25376 |
| CITY HOMES MANAGEMENT LLC | * | Case No: 13-25377 |
| CITY HOMES NEWINGTON LLC | | Case No: 13-25378 |
| CITY HOMES OCALA LLC | * | Case No: 13-25379 |
| CITY HOMES PATRIOTS II LLC | | Case No: 13-25380 |
| CITY HOMES PEABODY LLC | * | Case No: 13-25381 |
| CITY HOMES ROYALTON LLC | | Case No: 13-25382 |
| CITY HOMES WEST BUSINESS TRUST | * | Case No: 13-25383 |
| Debtors[1] | * | (Joint Administration Requested) |

\* \* \* \* \* \* \* \* \* \* \* \* \*

AFFIDAVIT OF BARRY MANKOWITZ
IN SUPPORT OF FIRST-DAY MOTIONS

I, Barry Mankowitz, being over the age of 21 and being duly sworn, depose and state, under penalty of perjury, that the following information is true to the best of my knowledge, information and belief.

I.    BACKGROUND

A.    Introduction

1.    I am the president of City Homes, Inc., which is the sole member of City Homes Bretton LLC, City Homes III LLC, City Homes Johnston Square LLC, City Homes Management LLC, City Homes Newington LLC, City Homes Ocala LLC, City Homes Patriots II LLC, City Homes Peabody LLC, and City Homes Royalton LLC, and the sole trustee of City Homes East Business Trust and City Homes West Business Trust.  In this capacity, I am familiar with the day-to-day operations, financial condition, books and records, and business

---

[1]    The Debtors in these Chapter 11 bankruptcy cases are City Homes, Inc., City Homes Bretton LLC, City Homes East Business Trust, City Homes III LLC, City Homes Johnston Square LLC, City Homes Management LLC, City Homes Newington LLC, City Homes Ocala LLC, City Homes Patriots II LLC, City Homes Peabody LLC, City Homes Royalton LLC, and City Homes West Business Trust.

affairs of the affiliated Debtors (collectively, the "Companies"). I submit this Affidavit in support of the Companies' Chapter 11 petitions, first-day applications, and motions listed on **Exhibit 1** hereto (the "First-Day Motions").

2.     Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Companies' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Companies' industry, operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Companies.

3.     To minimize any adverse effects on our businesses as a result of the commencement of the Companies' Chapter 11 cases, the Companies have requested various types of relief in the First-Day Motions. The First-Day Motions seek relief, among other things, to (a) approve, on an interim basis and final basis, the use of cash collateral which is needed to cover day-to-day operating expenses at the onset of these cases, (b) permit the continuation of the Companies' cash management system and other business operations without interruption, (c) maintain employee morale and confidence, and (d) establish certain other administrative procedures to promote a smooth transition into Chapter 11. Gaining and maintaining the support of the Companies' employees, tenants, creditors, vendors and other key constituents as well as maintaining the day-to-day operations of the Companies' businesses with minimal disruption, will be critical to the Companies' efforts in Chapter 11 and their ability to maximize the recovery prospects for all interested parties. The relief requested in the First-Day Motions is in the best interest of the Companies, their creditors and estates, and is necessary to avoid immediate and irreparable harm.

**B.     Overview of the Companies' Businesses**

4.     The Companies are tax-exempt, nonprofit entities that own and operate over 327 units of affordable housing in neighborhoods in Baltimore City. City Homes, Inc. was created in 1986 and the other entities have been created since that time.

5.      City Homes, Inc. ("CHI") is a corporation formed under Maryland law for the purpose of developing and managing affordable rental housing for low-income families in Baltimore City.  CHI is the sole member and/or trustee of the other Companies.

6.      City Homes Management LLC ("CH Management") is a limited liability company formed under Maryland law for the purpose of owning and operating or to act as a member or partner in an entity formed to acquire, own, develop and operate housing for low and moderate income families.  CH Management is the entity primarily responsible for the management of the 327 units as owned by the other Companies and the 98 units as owned by other related affiliates.

7.      City Homes Bretton LLC, City Homes III LLC, City Homes Johnston Square LLC, City Homes Newington LLC, City Homes Ocala LLC, City Homes Patriots II LLC, City Homes Peabody LLC, City Homes Royalton LLC are limited liability companies formed under Maryland law for the purpose of acquiring, owning, developing, managing, operating, and otherwise dealing with real property.

8.      City Homes East Business Trust and City Homes West Business Trust are trusts formed under Maryland law for the purpose of acquiring, owning, developing, managing, operating, and otherwise dealing with real property

9.      The Companies serve very low income tenants.  Approximately eighteen percent of the households have Section 8 subsidies and the remainder pay below market rents.

10.     The Companies offer 1, 2, 3, 4, and 5 bedroom apartments and single-family row homes.

11.     The majority of the units were developed with low-income housing tax credits and city and state funding.

12.     The vacancy rate of the Companies' entire portfolio generally runs between two percent and six percent.

13.     CH Management prides itself on being a model landlord.  Although the units are generally modest, they are typically better maintained and less expensive than

comparable units owed by private investors.  The support of private donors and special financing from state and local governments have enabled the Companies to charge below-market rates.

14.     In addition to keeping units well maintained, collecting rents and running an efficient account system, CH Management prides itself on having a full-time tenant coordinator who works with residents on issues related to their health, child care, and financial stability.

15.     The Companies performed well from 1987 through 2010.  During this period, the rents and management income covered all operating and administrative expenses, debt service and reserve and replacement requirements.

16.     More recently, the Companies began experiencing operating losses. This was due in significant part to increasing costs of operating the Companies' aging rental units and slower rent increases in the mostly troubled neighborhoods in which the Companies' units are located.  The Companies also experienced substantial increases in legal expenses due to lead paint claims.  In 2011 and 2012, the Companies had consolidated operating losses of $783,000 and $431,238 respectively (per the Companies' tax returns).

17.     In addition, several of the Companies have had to sell properties.  Sale of property increased the cash available for operating losses but reduced revenue potential.

C.     **Growth of the Businesses**

18.     CHI started its first project in 1987 when it acquired and rehabilitated 101 scattered-site row houses in West Baltimore.  CHI's second acquisition, in 1988, involved the rehabilitation of 70 scattered-site row houses in East Baltimore.  It completed its third project in 1994, which involved the acquisition and rehabilitation of 69 scattered-site row houses in East and West Baltimore.

19.     The Companies added 228 rental units to the portfolio from 1996 until 2002, when they took over property management and then ownership of seven troubled rental apartment buildings and row house projects that had been developed by other nonprofit corporations.  The Companies added an additional 47 rental units that were largely donated by others.

20.     Certain of these units have been sold to Baltimore City because they were in areas designated by the City for redevelopment.  Several others were sold to other private parties.

21.     Since 2002, the Companies have not been able to acquire more rental units due to difficulties in identifying feasible properties and obtaining financing.  The growing volume of pending lead-related lawsuits also places a pall on the Companies' ability to obtain financing.

22.     The resulting lack of growth has contributed to the Companies' operating losses.  Because the Companies have not been able to acquire new units, they are unable to increase operating efficiencies by spreading their fixed costs over more rental units.

**D.    Events Leading to Bankruptcy**

23.     The Companies have diligently strived to provide affordable and safe homes for their residents.  Nevertheless, in recent years, lead paint litigation suits brought by current and former tenants have dramatically escalated, and there are now more than 70 active cases against the Companies, and many more are anticipated.  This has increased the Companies' legal expenses and contributed to operating losses.

24.     Furthermore, although the Companies have liability insurance covering incidents of alleged exposure up to August 1999, since then, the Companies (and to the best of their knowledge all other rental property owners in Baltimore) have been unable to obtain liability insurance that includes full lead-related coverage.

25.     The Maryland Court of Appeals, in its October 24, 2011 decision known as *Jackson v. Dackman*, struck down the "immunity provision" in the state's lead law, the 1994 Reduction of Lead Risk in Housing Act, which had limited landlords' liability to $17,000 if they otherwise complied with the law.  This decision greatly increased the likelihood of additional lawsuits against the Companies that allege exposure to lead substances, even though the Companies continue to comply with the 1994 law.

26.     As a result of the 70 pending lead paint lawsuits and the many more anticipated, the Companies must stabilize their affairs and consider all options going forward.

## II.    FIRST-DAY MOTIONS[2]

27.    Concurrently with the filing of these Chapter 11 cases, the Companies filed a number of First-Day Motions.  The Companies anticipate that the Court will conduct a hearing soon after the commencement of these cases (the "First-Day Hearing"), at which time the Court will hear the First-Day Motions.

28.    An important and critical element of the success of these Chapter 11 cases will be the entry of orders granting the relief requested in each of the First-Day Motions. Generally the First-Day Motions are designed to facilitate:  (a) the continuation of the Companies' business operations without interruption and to approve on an interim basis the use of cash collateral, (b) preservation of tenant and vendor relationships, (c) maintenance of employee morale and confidence, and (d) establishment of certain other administrative procedures to promote a smooth transition into Chapter 11.  The factual background in support of each First-Day Motion is provided below:

### A.    The Companies' Motion for Order (A) Authorizing the Companies' Interim and Final Use of Cash Collateral under 11 U.S.C. §§ 361, 363, and 552, (B) Granting Adequate Protection, and (C) Scheduling a Final Hearing Pursuant to 11 U.S.C. § 363(c)(2) and Fed.R.Bankr.P. 4001

29.    As part of the acquisitions and rehabilitation of the rental units, certain Companies[3] obtained funding from state and local authorities and private lenders.  These Secured Parties are The Harbor Bank of Maryland (successor by assignment from Community Capital of Maryland, Inc.); Department of Housing and Community Development of the State of Maryland ("DHCD")/ Community Development Administration ("CDA"); Mayor and City Council of Baltimore and The Enterprise Loan Fund, Inc., as further identified in the motion.

30.    The Secured Parties claim a lien on these Companies' assets, including all rents, income and profits that become due or owing under the leases on account of the use and/or occupancy of the rental units as referenced in the applicable loan documents.

---

[2]    Capitalized terms not defined herein have the meanings ascribed to them in the respective First-Day Motions.

[3]    City Homes Bretton LLC, City Homes East Business Trust, City Homes III LLC, City Homes Johnston Square LLC, City Homes Ocala LLC, City Homes Peabody LLC, City Homes Royalton LLC, and City Homes West Business Trust are the Companies seeking use of Cash Collateral as defined herein.

31.     The day-to-day operations of these Companies are funded by the rental income generated from the housing units.  The proceeds and cash from the rental units constitute "Cash Collateral," as I understand that term.

32.     The Cash Collateral is necessary to fund day-to-day operations and to maintain and preserve the value of the assets for the benefit of the Companies' tenants, estates and creditors.

33.     By this motion, these Companies seek the interim use of Cash Collateral for ordinary and necessary overhead expenses, including but not limited to taxes, insurance, utilities, payroll, and routine and necessary vendors and suppliers during an interim fifteen day period (the "Interim Period"), in accordance with the budgets and on the terms set forth in the proposed Interim Order.  The Companies' use of Cash Collateral will be governed by the budgets submitted and will be used to preserve and maintain the value of their assets for the benefit of their estates and creditors.

34.     As adequate protection for the Secured Parties, among other things, the Companies (a) propose to provide continued financial and other reporting substantially in accordance with the prepetition credit facilities and (b) request that the Court grant replacement liens on substantially all of their postpetition property and assets, but solely to the extent of any net diminution of the Secured Parties' interests in the prepetition collateral resulting from (i) the use of Cash Collateral, (ii) the use, sale or lease of any other prepetition collateral, or (iii) the imposition of the automatic stay.  The Companies believe that these proposed arrangements will adequately protect the Secured Parties for the use of Cash Collateral during the Interim Period.

35.     If the Companies are unable to use Cash Collateral for such purposes, the recoveries for all creditors, including the Secured Parties, will be greatly reduced since, under a "shutdown" scenario, the value of their estates would decline dramatically and thus have an overall negative impact on the Companies' estates.  Entry of the Interim Order is thus (a) critical to the Companies' ability to maximize value for their creditors, (b) in the best interest of the Companies and their estates, and (c) necessary to avoid immediate and irreparable harm to the Companies, their tenants, vendors, creditors, assets, business, goodwill and reputation.

**B.    CH Management's Motion for an Order Authorizing Payment of Prepetition Wages,  Compensation, Employee Benefits, Expenses Reimbursements and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course**

36.    By this motion, CH Management requests the entry of an Order authorizing, but not requiring, CH Management to pay outstanding prepetition payroll obligations, employee benefits and reimbursable expenses, as well as authority to continue paying and/or otherwise honoring the ordinary employee benefits described below (collectively, the "Employee Obligations").

<u>Employee Compensation</u>

37.    As of the Petition Date, CH Management had approximately twelve employees, consisting of one president, one deputy director, one administrative assistant, one bookkeeper, one tenant coordinator, one receptionist, five maintenance workers, and one part-time porter.

38.    CH Management needs to retain its current employees so that it can operate its business in the ordinary course of its affairs.  In order to retain the employees, it is necessary to obtain the Court's permission to pay Employee Obligations.

39.    As of the Petition Date, CH Management employed eleven full-time employees and one part-time hourly employee.

40.    All employees are paid on a weekly basis.

41.    In addition to its weekly payroll, all employees are eligible for a year-end bonus based on performance for the fiscal year 2013.  The cumulative amount of the bonus is $27,000.

42.    Payroll and benefits are processed internally through CH Management's accounting department. However, pay checks and all taxes are processed through a third-party payroll service, Automatic Data Processing, Inc. ("ADP").

<u>Employee Benefits</u>

43.    In the ordinary course of business, CH Management offers various plan and policies to provide employees with vacation/sick time, as well as medical, dental, vision, life, long term disability, accidental death and dismemberment insurance, and 401(k) benefits

(collectively, the "Employee Benefits"). Full-time employees are eligible for the Employee Benefits. The part-time employee is eligible for vacation/sick time and 401(k) benefits only.

44.    Many employees have accrued paid time off as of the Petition Date, consistent with CH Management's current policy for paid time off.

45.    CH Management offers employer participating health insurance, including dental, vision and prescription coverage to its employees. CH Management pays $6,174 at the beginning of each month for employee health insurance and then is invoiced for the remainder due per actual plan participation. CH Management estimates that, as of the Petition Date, it will have an outstanding obligation of approximately $4,000 relating to employee health insurance premiums and claims.

46.    CH Management also provides all employees with (1) an automatic three-percent salary contribution to their 401(k) plan each year ("Automatic Contribution") and (2) for those employees that contribute to the 401(k) plan, CH Management will match fifty percent up to any six-percent contribution ("Match Contribution"). CH Management pays the Automatic Contribution at the beginning of the following calendar year. As of the Petition Date, CH Management does not have a current payment obligation for the Automatic Contribution; however the benefit is accruing during the course of the calendar year. CH Management estimates that the cumulative amount of the Automatic Contribution for 2013 will be approximately $25,900. CH Management pays the Match Contribution weekly and as of the Petition Date there is no outstanding obligation.

<u>Reimbursable Business Expenses</u>

47.    In the ordinary course of business, CH Management reimburses employees for actual, reasonable and proper business and travel expenditures incurred in the normal course of their employment ("Reimbursable Expenses"). Employees typically incur Reimbursable Expenses through the use of personal cash. As of the Petition Date, the CH Management estimates that it will have an outstanding obligation of approximately $450 relating to Reimbursable Expenses.

48.     CH Management's employees are essential to a successful reorganization. Deterioration in employee morale and welfare at this critical time would harm CH Management as well as the other Companies, the value of their assets and businesses.  The period immediately following a Chapter 11 filing is stressful and uncertain for a debtor's employees.  Such circumstances threaten employee morale just when a debtor most needs its employees' loyalty. Accordingly, the relief sought is in the best interest of CH Management's estate and its creditors, and would enhance CH Management's ability to continue to operate its business with minimal disruption.

49.     To minimize employee hardship and prevent wholesale loss of critical employees, CH Management, in the exercise of its business judgment seeks to continue to pay employee compensation in the ordinary course of its business.

50.     It is also essential that CH Management continues the employee plans and policies discussed in the motion in the ordinary course of business and on an uninterrupted basis. Payment of these obligations and the continuation of the related programs and policies are essential to maintain employee morale and ensure that CH Management retains its employees during this critical period.

**C.     Companies' Motion for an Order (i) Authorizing the Companies to Continue Use of Their Centralized Cash Management System, Existing Bank Accounts and Business Forms, and (ii) Waiving Temporarily, the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code**

51.     By this motion, the Companies request the entry of an Order authorizing them to continue using their existing cash management system, bank accounts and existing business forms, as defined below.

<u>The Companies' Cash Management System and Bank Accounts</u>

52.     In the ordinary course of business, the Companies maintain thirty-five bank accounts (the "Bank Accounts") that operate as part of a cash management system (the "Cash Management System").

53.     The Companies maintain all of their active operating accounts at Bank of America (the "Operating Accounts").  Through the Operating Accounts, the Companies collect,

transfer, and disburse funds generated from rental payments made by their tenants. The Companies routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Operating Accounts by various methods including check, electronic transfer and wire transfer.[4]

54.     Certain Companies also maintain operating reserve accounts with Bank of America (the "Reserve Accounts"). The Reserve Accounts were pre-funded during the development process and the funds are used to cover negative cash flow in the Companies' respective projects.

55.     The Companies maintain certain security deposit accounts with Advance Bank ("Security Accounts," and collectively with Operating and Reserve Accounts, the "Bank Accounts"). Through the Security Accounts, the Companies hold the security deposits in escrow for each tenant. The security deposits are only disbursed upon termination of residency. The security deposits are either refunded to the tenant or applied to outstanding fees due the Companies pursuant to the applicable lease agreement.

The Companies' Business Forms

56.     In the ordinary course of business, the Companies use a variety of business forms. To minimize the expense to the estates and to avoid any confusion with tenants, suppliers, customers, and employees, the Companies respectfully request that the Court authorize the Companies to continue to use all business forms, including without limitation, checks, letterhead, customer program forms, purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such forms were used by the Companies prior to the Petition Date, without reference to the Companies' status as debtors in possession. Granting this relief will allow the Companies to avoid the cost and delay of ordering new business forms. Upon depletion of the current stock of forms and checks, the Companies will obtain new checks and forms that indicate debtor in possession status.

---

[4]  Certain non-debtor affiliates are also separately operated and managed by City Homes Management, LLC. These include City Homes Central I Business Trust, City Homes Central II Business Trust, City Homes Central III Business Trust, City Homes Central IV Business Trust, City Homes Central V Business Trust, City Homes Office Business Trust, City Homes Patriots I LLC, City Homes Patriots III LLC, City Homes Patriots IV LLC, and City Homes Patriots V LLC. During the pendency of these cases, no funds of the Debtors will be paid for or on behalf of the non-debtor affiliates without Court order. The income from these entities will continue to be managed by City Homes Management, LLC.

## Continued Use of a Cash Management System
## and Continued Use of Business Forms is Warranted

57.     The Companies' Cash Management System and Bank Accounts are established and are significant aspects of the Companies' ordinary course, essential business practices.  The Companies' Bank Accounts are part of a system that ensures the Companies' ability to monitor and control all of their cash receipts and disbursements efficiently.  Further, these accounts have already been set up to receive automatic tenant payments and payments from Section 8 housing authorities.  The process to redirect payments from the Section 8 housing authorities is a complicated process and has the potential to cause an unnecessary delay to the Companies in receiving tenant payments.

58.     Most of the Bank Accounts are maintained with Bank of America, an approved debtor-in-possession depository.  These are susceptible of oversight by the U.S. Trustee.  Further, the Companies will properly report on all accounts as required by a debtor in possession.

59.     The Companies' ability to manage rent collections and track receipts and disbursements using their existing Bank Accounts and centralized Cash Management System is critical to their operations.  During the pendency of their bankruptcy cases, the Companies intend to fund operations from existing cash and postpetition revenues, all of which revenues will run through their Cash Management System.

60.     If the Companies were required to close all existing Bank Accounts and terminate the Cash Management System immediately, I believe it would be extremely difficult and expensive to establish the required multitude of new bank accounts promptly and a new cash management system with sufficient sophistication to fulfill the Companies' business needs.  Further, the disruption to the ordinary financial affairs of the Companies would be prejudicial to their estates.

61.     In addition, the Companies request that, as a way of minimizing expenses to their estates, they be authorized to continue to use their correspondence and Business Forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.  The Companies propose that, in the event they need to purchase

new Business Forms during the pendency of their Chapter 11 cases, such forms will include a legend referring to the Companies' status as debtors in possession.

62.    It is my belief that, absent authorization to continue to use the Companies' existing Bank Accounts, Cash Management System and Business Forms in the ordinary course of business, significant and unnecessary disruption to the Companies' businesses will occur.

**D.    Motion of the Companies for an Order Directing Joint Administration of their Related Chapter 11 Cases**

63.    Given the affiliation between the Companies and the integration of the Companies' operations, joint administration of the Chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in the Chapter 11 cases will affect all Companies.  The entry of an Order approving joint administration will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor the Chapter 11 cases with greater ease and efficiency.

64.    Moreover, joint administration will not adversely affect the Companies' respective constituencies because the motion requests only administrative, not substantive, consolidation of the estates.  Thus, parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of the Chapter 11 cases.  Accordingly, the Companies submit that the joint administration of their Chapter 11 cases is in the best interest of the Companies' estates, their creditors, and all other parties in interest.

**III.    CONCLUSION**

65.    Approval of the First-Day Motions filed by the Companies is crucial to the Companies' ability to continue their businesses.  Without the relief requested, the Companies will be forced to cease operations, which would have an immediate detrimental effect on over 300 tenants.  The requested relief also will assist the Companies in maintaining employee morale and establishing certain other administrative procedures to promote a smooth transition into Chapter 11.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:_____September 10, 2013_____      _____/s/ Barry Mankowitz_____
                                             Barry Mankowitz

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of September 2013, notice of filing Affidavit of Barry Mankowitz in Support of First-Day Motions (the "Affidavit") was sent electronically to those parties listed on the docket as being entitled to such electronic notice, and, on the 11th day of September 2013, a copy of the Affidavit was mailed first class, postage prepaid to the parties on the attached service list.

_/s/ James A. Vidmar_____<br>
James A. Vidmar

**Consolidated List of 20 Largest
Unsecured Creditors:**

Andrew Parmlee, III
8711 Eddington Road
Baltimore, MD 21234

Brandon Foster
251 South Ellwood Avenue
Baltimore, MD 21224

Briana L. Kinsler
1403 Kirkwood Road
Gwynn Oak, MD 21207

Carlisa S. Lewis
1609 North Milton Avenue
Baltimore, MD 21213

Cecil Harris, III
513 North Curley Street
Baltimore, MD 21205

Chantera Davis
746 Grantley Street
Baltimore, MD 21229

Charles E.K. Blount
3811 Norfolk Avenue
Baltimore, MD 21216

Corvonte Khalid Burgess
12917 Kentbury Drive
Clarksville, MD 21029

Danae Lynnett Mack
1620 Latrobe Street
Baltimore, MD 21202

Daquan Jamal Butler
918 Erie Street
Havre De Grace, MD 21078

Darmonique Hamlin
1657 Cliftview Avenue
Baltimore, MD 21213

Daunte Harper
2715 Spellman
Baltimore, MD 21225

Demetre Quick
1912 Barry Road
Dundalk, MD 21222

Dennis Edward Hughes
5350 Arlington Expressway
Jacksonville, FL 32211

Dontae Stinnette
c/o David F. Albright, Jr., Esquire
Bennett & Albright, P.A.
201 North Charles Street, Suite 500
Baltimore, MD 21201

Ernest A. Bell, Jr.
2024 East Lafayette Street
Baltimore, MD 21213

Gabriel Alexander
3113 Tindale Avenue
Baltimore, MD 21214

Ivan Turner, Jr.
1210 Punjab Drive
Essex, MD 21221

Jaquitta Sabb
31 North Potomac Street
Baltimore, MD 21224

Jasmere Fisher
2813 The Alameda
Baltimore, MD 21218

Jerett Alston
2500 Wildpark Avenue
Parkville, MD 21234

Jovar Joyner
1634 North Bond Street
Baltimore, MD 21213

Kendea Poteat
2547 West Lafayette Avenue
Baltimore, MD 21216

KeWuan K. Hardy
3907 Edgewood Road
Baltimore, MD 21215

Korryn Gaines
1149 North Carrolton Avenue
Baltimore, MD 21217

Laru L. Wright
1829 Eagle Street
Baltimore, MD 21223

Latarsha Pierce
5503 Lynview Avenue
Baltimore, MD 21215

Lisa Latia Graves
416 West 29th Street
Baltimore, MD 21218

Lynell Watson
3539 Dudley Avenue
Baltimore, MD 21213

Marion Smith
3601 Howard Park Avenue
Baltimore, MD 21216

Martieze Brockington
1146 Kelfield Drive
Halethorpe, MD 21227

Marvin Carroll, III
4609 Frankford Avenue
Baltimore, MD 21206

Nakell Harris
1211 Argle Avenue
Baltimore, MD 21217

Nashay Heard
501 Hoffman Street
Baltimore, MD 21201

Raynell A. Alfonso
1773 Homestead Street
Baltimore, MD 21218

Robert Miller
3539 Dudley Avenue
Baltimore, MD 21213

Savon Johnson
2806 Hamilton Avenue
Baltimore, MD 21214

Shaday Adams
307 South Payson Street
Baltimore, MD 21223

Shamata Phillips
206 South Gilmore Street
Baltimore, MD 21223

Sharnisha Holmes
c/o Saul E. Kerpelman, Esquire
Equitable Building, Suite 600
10 North Calvert Street
Baltimore, MD 21202

Shatia Drummond
325 McMechen Street
Baltimore, MD 21217

Stacie Thomas
311 52nd Street
Baltimore, MD 21224

Stephen Howard
3411 Keene Avenue
Baltimore, MD 21214

Terrea Zaniquea Swilling
3439 Reisterstown Road
Baltimore, MD 21215

Tiffany Renee Henriques
3138 Cliftmont Avenue
Baltimore, MD 21213

Tyese Boykin
1302 Mosher Street
Baltimore, MD 21217

Willard Richard Brown, Jr.
2287 Fisherman Lane
Dillon, SC 29536

**Counsel for 20 Largest Unsecured Creditors:**

David F. Albright, Jr., Esquire
Bennett & Albright, P.A.
201 North Charles Street, Suite 500
Baltimore, Maryland  21201

Alan Joseph Mensh, Esquire
Law Offices of Ashcraft & Gerel LLP
10 East Baltimore Street, Suite 1212
Baltimore, Maryland  21202

Saul E. Kerpelman, Esquire
Equitable Building, Suite 600
10 North Calvert Street
Baltimore, Maryland  21202

William Beveridge/Scott E. Nevin/
Bruce H. Powell/Joseph E. Spicer/
George Swegman
The Law Office of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland  21201

Evan K. Thalenberg, Esquire
Nicholas A. Szokoly, Esquire
Law Offices of Evan K. Thalenberg, PA
216 East Lexington Street
Baltimore, Maryland  21202

Michael A. Pulver, Esquire
The Yost Legal Group
341 North Calvert Street, Suite 100
Baltimore, Maryland  21202

**The Debtors' secured creditors:**

City of Baltimore
Department of Finance
200 Holiday Street
Baltimore, MD 21202

The Harbor Bank of Maryland
25 West Fayette Street
Baltimore, MD 21201

Enterprise Loan Fund, Inc.
70 Corporate Center
11000 Broken Land Parkway, Suite 700
Columbia, MD 21044

Mayor and City Council of Baltimore
100 North Holliday Street LL82
Baltimore, MD 21202

Mayor & City Council of Baltimore
Bureau of Revenue Collections
Abel Wolman Municipal Building
200 Holliday Street
Baltimore, MD 21202

MD DHCD/CDA
Attention: Kathleen Kenney
100 Community Place
Crownsville, MD 21032

MD DHCD/CDA
Attention: Sandra Kronstadt
100 Community Place
Crownsville, MD 21032

MD DHCD/CDA
Attention: Jane Slogum
100 Community Place
Crownsville, MD 21032

MD DHCD/CDA
Attention: Bill Wiley
100 Community Place
Crownsville, MD 21032

**EXHIBIT 1**

List of First-Day Motions

A.      Debtors' Motion for Order (A) Authorizing the Debtor's Interim and Final Use of Cash Collateral under 11 U.S.C. §§ 361, 363, and 552, (B) Granting Adequate Protection, and (C) Scheduling a Final Hearing Pursuant to 11 U.S.C. § 363(c)(2) and Fed.R.Bankr.P. 4001

B.      City Homes Management, LLC's Motion for an Order Authorizing Payment of Prepetition Wages, Compensation, Employee Benefits, Expenses Reimbursements and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course

C.      Debtors' Motion for an Order (i) Authorizing Debtors to Continue Use of Their Centralized Cash Management System, Existing Bank Accounts and Business Forms, and (ii) Waiving Temporarily, the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code

D.      Motion of the Debtors for an Order Directing Joint Administration of their Related Chapter 11 Cases